UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LIFE WIN, INC., a Florida corporation; GET
MOTIVATED SEMINARS, INC., a Florida
corporation; and WEALTH MAGAZINE
INVESTOR EDUCATION LLC, a Florida
limited liability company,

        Plaintiffs,

vs.

BRIAN FORTE, an individual; TAKE
ACTION MEDIA, INC., a Florida
corporation; and TAMARA LOWE, an
individual,

        Defendants.

_____/

Case No.:

INJUNCTIVE RELIEF REQUESTED

## COMPLAINT

    The plaintiffs, Life Win, Inc. ("Life Win"), Get Motivated Seminars, Inc. ("GMS"), and

Wealth Magazine Investor Education, LLC ("WMIE") (collectively, "the Plaintiffs" or "the

Companies"), through their undersigned counsel, hereby sue the defendants, Brian Forte ("Mr.

Forte"), Tamara Lowe ("Ms. Lowe"), and Take Action Media, Inc. ("TAM") (collectively, "the

Defendants"), and state as follows:

### Introduction

    1.    This action involves the Defendants' systematic theft of the Companies' business.

The Defendants have pirated away the Plaintiffs' property (such as desks, computers, files,

telephones, etc.); their customers; their employees; and their very identity.  Indeed, Defendants

are representing themselves as "Get Motivated"; controlling the Plaintiffs' web-site

(www.getmotivated.com); purporting to stage "Get Motivated" seminars; collecting money as

"Get Motivated"; and, on information and belief, signing contracts in Get Motivated's name.

Defendants' actions are tortious, violate the Federal Lanham Act and State law, and, in Mr. Forte's case, violate a clear and unequivocal agreement not to compete with the Companies. The Plaintiffs are entitled to temporary and permanent injunctive relief to preserve the "Get Motivated" brand and to recover damages they have suffered as a result of the Defendants' actions.

2.      With regards to the injunctive relief sought, the Plaintiffs seek, among other things, an order from this Court requiring the Defendants (a) to return to the Plaintiff all property the Defendants have misappropriated; (b) to cease their use of the Get Motivated trade name and trademarks and cease doing business as Get Motivated; (c) to return control of the Plaintiffs' web-site and other information outlets back to the Plaintiffs; and (d) to take these actions and any other actions required to transition the Plaintiffs' business back to the Plaintiffs timely and in an manner that will not harm the "Get Motivated" brand.

## Parties, Jurisdiction, and Venue

3.      Life Win is a Florida corporation with its principal place of business located in Hillsborough County, Florida.

4.      GMS is a Florida corporation with its principal place of business located in Hillsborough County, Florida.

5.      WMIE is a Florida limited liability company with its principal place of business located in Hillsborough County, Florida.

6.      Until January 9, 2011, Peter S. Lowe ("Mr. Lowe") was the sole owner of the Companies. On January 9, 2011, Mr. Lowe sold the Companies to an entity managed or controlled by Joseph Johnson ("Mr. Johnson"), Booker T. Equity Limited Liability Company. That entity now is now the sole owner, officer, and director of the Companies. Mr. Lowe remains associated with the Companies as an independent contractor.

2

7.      Mr. Forte is an individual who resides in Hillsborough County, Florida.

8.      Ms. Lowe is an individual who resides in Palm Beach County, Florida. Mr. Lowe and Ms. Lowe were married, but are now seeking a divorce.

9.      TAM is a Florida corporation with its principal place of business located in Palm Beach County or Hillsborough County, Florida. Upon information and belief, both Mr. Forte and Ms. Lowe are owners, officers, and/or directors of TAM, or otherwise are associated or affiliated with TAM.

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as the action involves federal questions under the Lanham Act. This Court has jurisdiction over the non-federal-question claims under 28 U.S.C. § 1367.

11.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(b). Venue also is proper in this Court pursuant to § 9(h) of the Confidentiality, Nondisclosure and Noncompete Agreement described below ("the Agreement").

### Brian Forte and His Agreements With the Companies

12.     The Plaintiffs and their affiliates are engaged in the business of, among other things, (a) providing nationwide motivational and educational seminars and services, including associated administrative, financial, marketing, consulting, or management services; and (b) selling related merchandise and accessories.

13.     Mr. Forte formerly was an employee or independent contractor of Life Win and certain of its affiliates, including GMS (collectively, "the Companies").

14.     As an employee or independent contractor of the Companies, Mr. Forte had access to the Companies' proprietary and confidential business information and trade secrets, including, without limitation, customer and vendor information, contact lists, business methodologies and processes, marketing, promotional and training materials, technical

information, computer software and databases, and information concerning the Companies' financing and expansion.

15.     Information of this nature is not generally known to the public and is critical and essential to the success and existence of the Companies.  The Companies therefore have taken, and continue to take, appropriate measures to protect and maintain the confidentiality of the information.

16.     For example, on or about January 14, 2002, in consideration of Mr. Forte's employment, Mr. Forte and Life Win, and certain of Life Win's affiliates, including GMS, entered into the Agreement.  A copy of the Agreement is attached hereto as **Exhibit A**.

17.     Pursuant to the Agreement, Mr. Forte agreed and acknowledged, among other things, that he would be made privy to confidential and proprietary information, and therefore would not disseminate the information to third parties during his employment with the Companies, or for a period of five years thereafter:

> [T]he Employee has been and/or will be exposed to and has received or will receive confidential and proprietary information of the Company and its Affiliates or relating to the Company's or its Affiliates' business or affairs, including but not limited to technical information, computer software, know-how, product information, formulae, processes, business and marketing plans, strategies, customer information, training and operational procedures, other information concerning the Company's or its Affiliate's products, promotions, development, financing, expansion, plans, business policies and practices, and other forms of information considered by the Company and its Affiliates to be proprietary and confidential or in the nature of trade secrets (collectively, the **"Trade Secrets and Other Confidential Information"**). *The parties acknowledge and agree that the Trade Secrets and Other Confidential Information are valuable, special and unique assets of the Company and its Affiliates and that the Trade Secrets and Other Confidential Information which the Employee has received and/or will receive would allow the Employee or a third party recipient of such information to unfairly and inequitably compete*

4848-8124-6734.2

*against the Company or its Affiliates and to otherwise cause the Company irreparable harm.*[1]

. . .

1.   **Confidentiality.**

    **a.**    **Unauthorized Disclosure.**  The Employee agrees that during the course of his or her[] employment with the Company and until the date ending five years following the termination of his employment *the Employee will keep such Trade Secrets and Other Confidential Information confidential and will not disclose or furnish to any other person[] or, directly or indirectly, use for his own account or the account of any other person, any Trade Secrets and Other Confidential Information, no matter from where or in what manner he may have acquired such Trade Secrets and Other Confidential Information, and he shall retain all such Trade Secrets and Other Confidential Information in trust for the benefit of the Company, its Affiliates and the successors and assigns of any of them.*  This confidentiality covenant has no geographical or territorial restriction.  *Upon the termination of employment, the Employee promptly will supply to the Company all property, keys, notes, memoranda, writings, lists, files, reports, customer lists, correspondence, tapes, disks, cards, surveys, maps, logs, machines, technical data, formulae or any other tangible product or document which have been produced by, received by or otherwise submitted to the Employee in the course of his employment with the Company*, including the period during and prior to the Employee's employment with the Company.

    **b.**    **Inventions.**  The Employee agrees that any and all inventions, discoveries, improvements, processes, formulae, copyrights and trademarks made, developed, discovered or acquired by him during his employment by the Company solely or jointly with others or otherwise, which relate to the business of the Company and its Affiliates, and all knowledge possessed by the Employee relating thereto (collectively, the **"Inventions"**) . . . shall be the sole and absolute [property of the Company].  *The Employee agrees that he will at all times keep all Inventions secret from everyone except the Company* . . . .

. . .

---

   [1] All emphasis in quoted material herein is supplied unless otherwise noted.  All capitalized terms not defined herein shall have the meaning given in the Agreement.

> **7.   Redelivery of Confidential Material.**  Upon the Company's request, and in any case upon the termination of Employee's employment, *the Employee shall promptly deliver to the Company . . . all written data containing, or reflecting any information about the Company . . . (whether prepared by the Company or otherwise, and whether in the possession of the Employee or his representatives) and will not retain any copies, extracts or other reproductions in whole or in part of such data*. The redelivery of such material shall not relieve the Employee of his obligation of confidentiality or of the other obligations imposed hereunder.

(Agreement at p. 1 and §§ 1(a), 1(b), and 7; bold in original.)

18.   Mr. Forte also agreed that, during his employment or association with the Companies and for a period of two years thereafter, he would not (a) solicit the Companies' employees, or otherwise interfere with the relationship between the Companies and their employees; (b) interfere with the relationships between the Companies and their customers, or any other business relationships; or (c) engage in certain competitive activities:

> **2.   Prohibited and Competitive Activities.**  The Employee and the Company recognize that due to the nature of the Employee's engagement by the Company, and the relationship of the Employee to the Company, both prior and subsequent to the date of this Agreement, *the Employee has had and will have access to, has had and will acquire, and has assisted and may continue to assist in developing Trade Secrets and Other Confidential Information. The Employee acknowledges that such Trade Secrets and Other Confidential Information has been and will be of central importance to the business of the Company and its Affiliates and that disclosure of it to, or its use by, others (including, without limitation, the Employee (other than with respect to the Company's business and affairs)) could cause substantial loss to the Company and its Affiliates.  The Employee and the Company also recognize that an important part of the Employee's duties and responsibilities will be to develop goodwill for the Company and its Affiliates through his personal contact with Customers . . . , employees and others having business relationships with the Company and its Affiliates, and that there is a danger that this goodwill, a proprietary asset of the Company, or its Affiliates, may follow the Employee if and when his relationship with the Company is terminated*.  The Employee accordingly agrees as follows:

6

a.     **Prohibited Activities**.  _The Employee will not_, at any time during the course of Employee's employment and for the two (2) year period following the termination of Employee's employment: (i) _directly or indirectly through one or more intermediaries, solicit for employment, employ or be involved with the employment of any person who, at the time of such solicitation, is employed by the Company or any Affiliate thereof_; [or] (ii) _directly or indirectly, whether for his own account or for the account of any other person, solicit, divert or endeavor to entice away from the Company or any Affiliate, or otherwise engage in any activity intended to terminate, disrupt or interfere with, the Company's or any of its Affiliates' relationships with, Customers, or otherwise adversely affect the Company's or any of its Affiliates' relationship with Customers or other business relationships of the Company or any Affiliate thereof_ . . . .

b.     **Non-Competition**.  For and in consideration of the compensation and benefits to be provided by the Company to the Employee, and further in consideration of the Employees' continued exposure to the confidential and proprietary information of the Company (including, without limitation, the Trade Secrets and Other Confidential Information), _the Employee agrees that the Employee will not_, during the course of Employee's employment, or until the date ending two (2) years following the termination of Employee's employment, _engage in any Competitive Activity_ . . . . For purposes of this Agreement, the term **"Competitive Activity"** shall mean engaging in any of the following activities: (1) serving as director of any Competitor . . . ; (2) directly or indirectly through one or more intermediaries, either [A] controlling any Competitor or [B] owning any equity or debt interest in any Competitor . . . ; (3) employment by (including, without limitation, serving as an officer or partner of), providing consulting services to (including, without limitation, as an independent contractor), or managing or operating the business or affairs of, any Competitor; or (4) participating in the ownership, management, operation or control of or being connected in any manner with any Competitor. For purposes of this Agreement, the term **"Competitor"** shall mean any person . . . that competes, either directly or indirectly, at the time of determination, in any **"Restricted Area"** . . . with the business conducted by the Company or any Affiliate thereof by selling, promoting, marketing or developing like products or services.  For purposes of this Agreement, the term "Restricted Area" shall mean any state or territory of the United States and any state or similar subdivision in Canada, Mexico or any country in Europe in which the Company or any Affiliate thereof conducts business of proposes (in the business plan of the Company effective as of the date hereof) to conduct business.

(*Id.* at §§ 2(a) and 2(b); bold in original.)

19.    Mr. Forte further agreed and acknowledged that (a) the foregoing contractual provisions are necessary and critical to the Companies and their legitimate business interests, and are reasonable in time and scope; and (b) in the event of a violation of the provisions, the Companies would suffer irreparable harm, and would be entitled to, among other things, injunctive relief and an accounting of, and equitable trust over, any profits or benefits received by Mr. Forte as a result of the violation:

> **4.    Enforcement.**  The parties understand and agree that the covenants set forth in this Agreement are essential elements of the Company's engagement of the Employee and that without the Employee's agreement to comply with such covenants, the Company would not have agreed to engage or to continue to engage the Employee, or to provide the Employee with Trade Secrets and Other Confidential Information.  Further, the *Employee expressly acknowledges that the restrictions contained in this Agreement are reasonable in scope, have been bargained for at arm's length and are necessary to accomplish the mutual objectives of the parties and to protect the Company's and its Affiliates' legitimate interests in protecting their business, business relationships and Trade Secrets and Other Confidential Information.  The Employee further acknowledges that any violation of the restrictions contained in this Agreement will cause significant and irreparable harm to the Company and its Affiliates for which the Company and its Affiliates has no adequate remedy at law*, regardless of the outcome of any litigation between the parties or money damages awarded therein.  The parties understand and agree further that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to the Company and its Affiliates in the event that any of the covenants of this Agreement are violated and that (in addition to any remedies or rights that may be available to Company and its Affiliates, all of which shall be deemed to be cumulative and retained by Company and its Affiliates and not waived by the enforcement of any remedy available hereunder), *the Company and its Affiliates shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including but not limited to a temporary restraining order, a temporary or preliminary injunction or a permanent injunction, to enforce the provisions of this Agreement as well as an equitable accounting of and constructive trust for all profits or other benefits arising out of or*

8

> *related to any such violation*, all of which shall constitute rights and remedies to which the Company and its Affiliates may be entitled.

(*Id.* at § 4; bold in original.)

20.    In consideration of Mr. Forte's agreement to the obligations set forth in the Agreement, the Company reposed trust and confidence in Mr. Forte, and permitted him virtually full and complete access to the Company's business operations.   More specifically, until recently, Mr. Forte served as the Company's Senior Vice President.   He thereafter continued to serve the Company as an independent contractor.   His duties remained essentially unchanged, except that he no longer had authority to enter into binding agreements for the Companies.   More specifically, but without limitation, Mr. Forte has:

a.    Effectively been the Company's Chief Operating Officer, responsible for, among many other things, hiring staff, overseeing operations, negotiating vendor contracts, and receiving direct reports from all senior personnel.

b.    Had complete access to, and responsibility for, all aspects of the Companies' business relationships, including those with the Company's employees, vendors, speakers, funding sources, and strategic partners.

c.    Overseen, supervised, and negotiated most (if not all) of the employment, independent contractor, and restrictive covenant agreements between the Company and its current and former employees.   Accordingly, he is fully aware (i) of the terms, and the importance to the Company, of the restrictive covenants, including his own; (ii) that all of the Company's employees and contractors are bound by restrictive covenants; and (iii) that TAM's hiring of the Company's employees (as described below) is in clear and indisputable violation of those restrictive covenants.

9

**Ms. Lowe's Relationship to the Companies**

21.     Mr. Prior to the events of December 2011, Ms. Lowe was associated with the Companies and held herself out as holding a position of responsibility.   For example,

a.     Ms. Lowe claims to be the "the co-founder and Executive Vice President of Get Motivated Seminars, Inc., a business training company that produces America's largest business seminars."  http://www.tamaralowe.com/Default.aspx?code=profile.

b.     Ms. Lowe claims to be the "co-founder and Chief Creative Officer of Get Motivated Seminars, Inc., a business training company that produces America's largest business seminars."  http://www.getmotivatedbook.com/ViewPage.aspx?code=about_tamara_lowe.

c.     Ms. Lowe lists getmotivated.com and getmotivatedbook.com as her contact information on Facebook:  http://www.facebook.com/people/Tamara-Lowe/1328093669.

22.     While associated with the Companies,  and as Mr. Lowe's wife, Ms. Lowe had access to the Companies' proprietary and confidential business information and trade secrets, including, without limitation, customer and vendor information, contact lists, business methodologies and processes, marketing, promotional and training materials, technical information, computer software and databases, and information concerning the Companies' financing and expansion.

**Mr. Forte's and Ms. Lowe's Unsuccessful Bid to Acquire the Companies**

23.     Beginning in or about October 2011, the Companies, through Mr. Lowe, engaged in a series of negotiations regarding Mr. Forte and Ms. Lowe potentially purchasing the Companies.

24.     The negotiations, however, were not successful because Mr. Forte and Ms. Lowe insisted upon, and demanded, terms with which Mr. Lowe could not agree.

25.     As a result, on December 10, 2011, the negotiations terminated.

26.     Shortly thereafter, apparently angered by Mr. Lowe's refusal to agree to his demands and terms, Mr. Forte reported to Mr. Lowe – in words or in substance – that he would

10

make sure that Mr. Lowe could no longer operate the Companies, or sell them to any other person or entity.

**Mr. Forte's and Ms. Lowe's Unlawful Actions to Steal the Companies**

27.     Mr. Lowe then discovered that, consistent with his threats, Mr. Forte and Ms. Lowe had taken actions intended to impair Mr. Lowe's ability to operate the Companies, and indeed to cause the ultimate downfall of the Companies.

28.     For example, and without limitation, Mr. Lowe discovered that Mr. Forte and Ms. Lowe has taken precipitous and unauthorized actions regarding the Companies' employees and other parties with which the Companies have continuing relationships, including those identified below, and as further described in this Complaint.

29.     Mr. Lowe also discovered that:

        a.      Mr. Forte and Ms. Lowe were employed by or affiliated with TAM, which was formed on March 23, 2011, and is a Competitor within the meaning of the Agreement; and

        b.      Upon information and belief, Mr. Forte and Ms. Lowe caused substantially all of the Companies' employees – all or substantially of whom had signed nondisclosure or noncompetition agreements – to resign, and refuse to communicate with Mr. Lowe.[2]

30.     Further, Mr. Lowe discovered that Mr. Forte and Ms. Lowe or TAM leased the space adjacent to the Companies' office ("TAM's Office") – located at 4710 Eisenhower

---

[2] It is extremely possible or likely that some or all of the former employees may have accepted employment with TAM.  However, given that, as noted below, the Defendants have restricted Mr. Lowe's access to personnel and payroll records, the Companies currently cannot confirm whether this is the case.

Boulevard, Suite B-5, Tampa, Florida 33634 ("the Companies' Office") – and removed most, if not all, of the Companies' property and transferred the same into TAM's Office.

31.     In that regard, on December 13, 2011, Mr. Lowe witnessed, among other things, several unidentified persons moving boxes and other property from the loading dock area of the Companies' Office to the adjacent loading dock area of TAM's Office, and into a large moving van (which presumably was to take the property to some undisclosed offsite location).  A copy of a picture depicting the removal of property from the Companies' Office is attached hereto as **Exhibit B**.

32.     Mr. Lowe also observed several of the Companies' computers and other IT equipment located in TAM's Office.  In fact, and notably, _those computers and IT equipment – which are the Companies' property – still were connected to the Companies' network through a hole in the wall between the Companies' Office and TAM's Office_.

33.     Further, on December 13, 2011, Mr. Lowe witnessed certain of the Companies' employees, or then former employees, at TAM's Office.  Those persons would have no reason whatsoever to be at TAM's premises in their capacity as employees of the Companies.

34.     Moreover, while at TAM's Office on December 13, 2011, Mr. Lowe witnessed an unidentified male in possession of two computer hard drives which belonged to the Companies. When the referenced male noticed Mr. Lowe, he attempted to run or otherwise quickly leave the area.   Upon request, however, he returned the hard drives to Mr. Lowe (presumably acknowledging that they were in fact property of the Companies).

35.     In addition:

a.     Virtually all of the Companies' furniture and other office equipment has been removed from the Companies' premises;

b.     The Defendants have taken control of the Companies' telephone numbers.

  c.  The Defendants have taken control of the Companies' domain name and domain site, www.getmotivated.com (the "Domain Site").

36. These actions by the Defendants have completely disabled the Companies from conducting business.  Having been frustrated in his desire to purchase the Companies, the Defendants has now set about to destroy the Companies and to appropriate to themselves virtually all of the Companies' value and assets.

37. For example, Plaintiffs have operated under the name "Get Motivated" (the "Name") and GMS has various trademarks (the "Marks"), including but not limited to the following:

  a.  GET MOTIVATED! BUSINESS SEMINAR (Ser. No. 85394152)

  b.  STAY MOTIVATED (Reg. No. 4048886)

  c.  GET MOTIVATED (Reg. No. 3286477)

  d.  GET MOTIVATED (Reg. No. 3535473)

  e.  GET MOTIVATED (Reg. No. 3267850)

38. Defendants are using the Name and one or more of the GMS Marks without authorization, and are using the Name and the Marks in competition against the owner of the Name and the Marks.

39. In fact, Defendants are conducting business in the name of Get Motivated – *as if they were Get Motivated*.   For example, on the Get Motivated Domain Site that Defendants have pirated away, Defendants are advertising and purporting to offer "Get Motivated" business seminars as their own, including seminars in:

  a.  Tucson on January 18, 2011;

  b.  Las Vegas on January 24, 2011;

  c.  Honolulu on Janaury 31, 2011;

d.      Tulsa on February 13, 2011;

e.      Oklahoma City on February 16, 2011;

f.      Sacramento on February 22, 2011;

g.      Miami on February 29, 2011; and

h.      San Jose on March 13, 2011.

40.     Moreover, upon information and belief, the Defendants (a) are utilizing the Companies' property and Trade Secrets and Other Confidential Information in connection with TAM's business; and (b) disclosed the Trade Secrets and Other Confidential Information to third parties.

41.     The Defendants had also precluded or restricted Mr. Lowe's access to the Companies' Office by, without limitation, directing the remaining employees to deny entry to Mr. Lowe.  For example, on December 13, 2011, Mr. Lowe attempted to gain access to the Companies' Offices.  Immediately upon Mr. Lowe's efforts in that regard, however, an unidentified person located inside the Companies Office grabbed the door and slammed it shut.

42.     In addition, Defendants have intentionally and unjustifiably interfered with the relationship between the Companies and their principal funding source ("Funding Company").

43.     More specifically, the Companies, through WMIE, previously entered into a contract with the Funding Company, whereby the Funding Company provides funds to the Companies for use in connection with their business operations.

44.     The funds are provided by the Funding Company on a weekly basis by wire transfer to an account maintained in the name of WMIE at Bank of America ("the Authorized Account").

45.     On December 12, 2011, though, the Funding Company reported to Mr. Lowe that:

14

a.      Mr. Forte contacted the Funding Company and directed it to cease depositing funds into the Authorized Account, and instead deposit the funds into a different account at Sun Trust Bank ("the Unauthorized Account"), which presumably could be accessed by Mr. Forte or TAM (and was opened without the knowledge or authorization of Mr. Lowe, who, again, is WMIE's sole owner and principal); and

b.      The Funding Company has subsequently deposited millions of dollars into the Unauthorized Account, which funds the Plaintiffs believe have been withdrawn or otherwise utilized by the Defendants.

46.     The Funding Company also informed Mr. Lowe that, on or about December 12, 2011, Mr. Forte reported to the Funding Company that he no longer was affiliated with the Companies, and that all of the Companies' employees had resigned.

47.     Because of Defendants' actions, the Plaintiffs relationship with the Funding Company has been seriously harmed.  Indeed, on January 12, 2011, the Funding  Company represented to Plaintiffs that they were now the funding source for Defendants.

48.     Given the actions and events described above, the Companies, through Mr. Lowe, terminated the Defendants effective December 13, 2011.[3]

49.     Since that time, the Defendants have continued wrongfully to hold themselves out as Get Motivate and to use the Name and the Marks.

50.     The Defendants' actions, generally described above, effectively have precluded and impaired the ability to operate the Companies.

51.     The Defendants' actions also have precluded Plaintiffs' ability to discover the full nature and extent of the damage caused by the Defendants, including, without limitation, the

actual amount and description of the property removed from the Companies' Office, and the actual number and identity of employees lost.  Stated differently, absent the relief requested herein, it will be impossible for the Companies to operate their business, and determine the full extent to which they have been damaged.

52.     All conditions precedent to the filing and maintenance of the cause of action set forth herein have been performed, waived, or excused.

### Count I
### Breach of Contract
### (Companies v. Mr. Forte)

53.     The Companies hereby re-allege and incorporate by reference the allegations contained in paragraphs 1-52 above as if fully set forth herein.

54.     The Companies and Mr. Forte previously entered into the Agreement.

55.     By entering into the Agreement, the Companies sought to, and did, protect their legitimate business interests, including, but not limited to, protection of (a) the Trade Secrets and Other Confidential Information; (b) substantial relationships with the Companies' employees, and with the Companies' prospective or existing customers; and (c) the Companies' goodwill.

56.     The restrictive covenants in the Agreement (cited above) are reasonable in scope, and are reasonably necessary to protect the Companies' legitimate business interests.

57.     The Companies fully performed all of their obligations under the Agreement.

58.     Mr. Forte materially breached the Agreement by, without limitation:

a.     Becoming employed or associated with TAM, or engaging in other Competitive Activities;

---

[3] The Companies and Mr. Lowe are without knowledge as to whether Mr. Forte previously terminated their employment with the Companies without providing notice.

b.  Improperly and without authorization removing the Companies' property and Trade Secrets and Other Confidential Information from the Companies' Office;

c.  Failing to return Trade Secrets and Other Confidential Information upon the termination of his employment with the Companies;

d.  Disclosing Trade Secrets and Other Confidential Information to third parties, including, without limitation, TAM;

e.  Soliciting the Companies' employees, or otherwise interfering with the relationships between the Companies and their employees; and

f.  Intentionally and unjustifiably interfering with the business or contractual relationships between the Funding Company and the Companies or their Affiliates, including WMIE.

59.  As a direct and proximate result of Mr. Forte's material breach of the Agreement, the Companies have suffered, and will continue to suffer, damages.

60.  Further, given Mr. Forte's actions in breach of the Agreement, the Companies have suffered, and if Mr. Forte is not enjoined, will continue to suffer, irreparable harm and injury for which the Companies have no adequate remedy at law.

61.  The Companies have a clear legal right to an injunction prohibiting Mr. Forte's improper actions, and likely will succeed on the merits in this action.

62.  The injunction requested herein will not disserve the public interest, and will not prejudice, or result in undue hardship on, Mr. Forte.

63.  The Companies have retained the undersigned counsel to prosecute the claims asserted herein, and are obligated to pay the undersigned a reasonable fee for their services.  Mr. Forte is obligated to pay the Companies reasonable attorneys' fees pursuant to § 9(j) of the Agreement and *Florida Statutes* § 542.335(1)(k) (to the extent applicable).

17

WHEREFORE, the Companies respectfully request that the Court enter its judgment:

a.      Temporarily, and upon final hearing permanently, enjoining Mr. Forte, and all persons or entities acting in concert or participation with him, from:

i.      disclosing the Companies' Trade Secrets and Other Confidential Information, or utilizing such information in a manner not permitted by the Agreement;

ii.      directly or indirectly employing or soliciting for employment, or becoming involved with the employment of, any employee of the Companies or any Affiliate thereof;

iii.      directly or indirectly soliciting, diverting or endeavoring to entice Customers away from the Companies or any Affiliate thereof, or otherwise engaging in any activity intended to terminate, disrupt or interfere with the relationships between the Companies and their Affiliates and their respective Customers or other business relationships, including, without limitation, the relationship between the Plaintiffs and the Funding Company;

iv.      engaging in any Competitive Activities, including, without limitation, (1) serving as director of any Competitor; (2) directly or indirectly controlling any Competitor, or owning any equity or debt interest in any Competitor; (3) becoming employed by, serving as an officer or partner of, or providing consulting or independent contractor services to any Competitor; or (4) participating in the ownership, management, operation or control of, or being connected in any manner with, any Competitor; and

v.      further prohibiting the Companies from accessing the Companies' property;

b.      Directing Mr. Forte, and all persons or entities acting in concert or participation with him, to:

i.      immediately notify counsel for the Companies, in writing (by delivery to cgriffin@foley.com) of the current location of anything whatsoever that the Defendants are

18

aware has been removed from the Companies' premises within the last 120 days (including, but not limited to, computers, furniture, files, documents, electronically stored information, and any and all copies, compilations, or extracts of same);

  ii. immediately return to the Companies – in the manner directed by the Companies' counsel – all Trade Secrets and Other Confidential Information (together with any and all copies, compilations, or extracts of such information), all property improperly removed from the Companies' Office and all property identified in accordance with subparagraph (i) above, and all funds improperly diverted from the Authorized Account to the Unauthorized Account (or any other location); and

  iii. take no further action, directly or through any other person, to remove or cause removal from the Companies' premises of anything whatsoever (including, but not limited to, computers, furniture, files, documents, and electronically stored information);

 c. Ordering an equitable accounting of all profits or other benefits realized by Mr. Forte, or by any persons or entities acting in concert or participation with him, as a result of his improper actions (as described above), and imposing a constructive trust in favor of the Companies over all such profits or benefits;

 d. Awarding the Companies compensatory damages capable of proof, together with interest as allowed by applicable law;

 e. Awarding the Companies their costs and reasonable attorneys' fees;

 f. Awarding the Companies punitive damages; and

 f. Granting such other and further relief that the Court deems proper.

4848-8124-6734.2

## Count II
## Misappropriation of Trade Secrets
## (Companies v. Defendants)

64.     The Companies hereby re-allege and incorporate by reference the allegations contained in paragraphs 1-52 above as if fully set forth herein.

65.     As described more fully above, the Defendants have in their possession the Trade Secrets and Other Confidential Information.

66.     The Trade Secrets and Other Confidential Information consist of, among other things, trade secrets within the meaning of *Florida Statutes* § 688.002(4).

67.     The Defendants have removed the Trade Secrets and Other Confidential Information from the Companies' Office without authorization, and are using the same in connection with TAM, or for other improper purposes.

68.     The Defendants' actions in that regard constitute misappropriation of trade secrets within the meaning of *Florida Statutes* § 688.002(2).

69.     As a direct and proximate result of the Defendants' misappropriation of the Companies' trade secrets, the Companies have suffered, and will continue to suffer, damages.

70.     Further, given the Defendants' improper actions, the Companies have suffered, and if the Defendants are not enjoined, will continue to suffer, irreparable harm and injury for which the Companies have no adequate remedy at law.

71.     The Companies have a clear legal right to an injunction prohibiting the Defendants' misappropriation, and likely will succeed on the merits in this action.

72.     The injunction requested herein will not disserve the public interest, and will not prejudice, or result in undue hardship on, the Defendants.

73.     The Companies have retained the undersigned counsel to prosecute the claims asserted herein, and are obligated to pay the undersigned a reasonable fee for their services.  The

20

Defendants are obligated to pay the Companies reasonable attorneys' fees pursuant to *Florida Statutes* § 688.005.

WHEREFORE, the Companies respectfully request that the Court enter its judgment:

a.        Temporarily, and upon final hearing permanently, enjoining the Defendants, and all persons or entities acting in concert or participation with them, from:

i.        disclosing the Companies' Trade Secrets and Other Confidential Information, or utilizing such information in a manner not permitted by the Agreement;

ii.        directly or indirectly employing or soliciting for employment, or becoming involved with the employment of, any employee of the Companies or any Affiliate thereof;

iii.        directly or indirectly soliciting, diverting or endeavoring to entice Customers away from the Companies or any Affiliate thereof, or otherwise engaging in any activity intended to terminate, disrupt or interfere with the relationships between the Company and its Affiliates and their respective Customers or other business relationships, including, without limitation, the relationship between the Plaintiffs and the Funding Company; and

iv.        further prohibiting the Companies from accessing the Companies' property;

b.        Directing the Defendants, and all persons or entities acting in concert or participation with them, to:

i.        immediately notify counsel for the Companies, in writing (by delivery to cgriffin@foley.com) of the current location of anything whatsoever that the Defendants are aware has been removed from the Companies' premises within the last 120 days (including, but not limited to, computers, furniture, files, documents, electronically stored information, and any and all copies, compilations, or extracts of same);

21

ii.      immediately return to the Companies – in the manner directed by the Companies' counsel – all Trade Secrets and Other Confidential Information (together with any and all copies, compilations, or extracts of such information), all property improperly removed from the Companies' Office and all property identified in accordance with subparagraph (i) above, and all funds improperly diverted from the Authorized Account to the Unauthorized Account (or any other location); and

iii.      take no further action, directly or through any other person, to remove or cause removal from the Companies' premises of anything whatsoever (including, but not limited to, computers, furniture, files, documents, and electronically stored information);

c.      Ordering an equitable accounting of all profits or other benefits realized by the Defendants, or by any persons or entities acting in concert or participation with them, as a result of their improper actions (as described above), and imposing a constructive trust in favor of the Companies over all such profits or benefits;

d.      Awarding the Companies compensatory damages and all other damages permitted by applicable law, including, without limitation, *Florida Statutes* § 688.004, and interest on such damages as allowed by applicable law;

e.      Awarding the Companies their costs and reasonable attorneys' fees;

f.      Awarding the Companies punitive damages; and

g.      Granting such other and further relief that the Court deems proper.

**Count III**
**Tortious Interference**
**(Plaintiffs v. Defendants)**

74.      The Plaintiffs hereby re-allege and incorporate by reference the allegations contained in paragraphs 1-52 above as if fully set forth herein.

22

75.     The Companies previously entered into nondisclosure and noncompetition agreements with their employees.

76.     The Defendants, through Mr. Forte, are aware of the existence of the nondisclosure and noncompetition agreements between the Companies and their employees.

77.     As more particularly set forth hereinabove, however, the Defendants have caused all or substantially all of the Companies employees to leave the Companies' employ and, on information and belief, to accept employment, or otherwise become associated with, TAM.

78.     The Defendants also have conducted business as if they were the Companies and have damaged to the contractual or business relationship with the Companies' current and prospective clients, contractors, and vendors.

79.     The Defendants also have made false statements and representations to the Funding Company, which have resulted, or if permitted to continue will result, in irreparable damage to the contractual or business relationship by and between the Funding Company and the Companies and their Affiliates, including WMIE.

80.     In doing so, the Defendants have intentionally and unjustifiably interfered with the contractual and business relationships between (a) the Companies and their employees; (b) the Companies or WMIE and the Funding Company; and (c) the Companies' current and prospective clients, contractors, and vendors.

81.     As a direct and proximate result of the Defendants' intentional and unjustified interference, the Plaintiffs have suffered, and will continue to suffer, damages.

82.     Further, given the Defendants' improper actions, the Plaintiffs have suffered, and if the Defendants are not enjoined, will continue to suffer, irreparable harm and injury for which the Companies have no adequate remedy at law.

23

83.     The Companies have a clear legal right to an injunction prohibiting the Defendants' misappropriation, and likely will succeed on the merits in this action.

84.     The injunction requested herein will not disserve the public interest, and will not prejudice, or result in undue hardship on, the Defendants.

WHEREFORE, the Plaintiffs respectfully request that the Court enter its judgment:

a.      Temporarily, and upon final hearing permanently, enjoining the Defendants, and all persons or entities acting in concert or participation with them, from:

i.      disclosing the Companies' Trade Secrets and Other Confidential Information, or utilizing such information in a manner not permitted by the Agreement;

ii.     directly or indirectly employing or soliciting for employment, or becoming involved with the employment of, any employee of the Companies or any Affiliate thereof;

iii.    directly or indirectly soliciting, diverting or endeavoring to entice Customers away from the Companies or any Affiliate thereof, or otherwise engaging in any activity intended to terminate, disrupt or interfere with the relationships between the Company and its Affiliates and their respective Customers or other business relationships, including, without limitation, the relationship between the Plaintiffs and the Funding Company; and

iv.     further prohibiting the Companies from accessing the Companies' property;

b.      Directing the Defendants, and all persons or entities acting in concert or participation with them, to:

i.      immediately notify counsel for the Plaintiffs, in writing (by delivery to cgriffin@foley.com) of the current location of anything whatsoever that the Defendants are aware has been removed from the Companies' premises within the last 90 days (including, but

not limited to, computers, furniture, files, documents, electronically stored information, and any and all copies, compilations, or extracts of same);

ii.     immediately return to the Companies – in the manner directed by the Companies' counsel – all Trade Secrets and Other Confidential Information (together with any and all copies, compilations, or extracts of such information), all property improperly removed from the Companies' Office and all property identified in accordance with subparagraph (i) above, and all funds improperly diverted from the Authorized Account to the Unauthorized Account (or any other location); and

iii.     take no further action, directly or through any other person, to remove or cause removal from the Companies' premises of anything whatsoever (including, but not limited to, computers, furniture, files, documents, and electronically stored information);

c.     Ordering an equitable accounting of all profits or other benefits realized by the Defendants, or by any persons or entities acting in concert or participation with them, as a result of their improper actions (as described above), and imposing a constructive trust in favor of the Companies over all such profits or benefits;

d.     Awarding the Plaintiffs compensatory damages, together with interest as allowed by applicable law;

e.     Awarding the Companies their costs and reasonable attorneys' fees;

f.     Awarding the Companies punitive damages; and

g.     Granting such other and further relief that the Court deems proper.

**Count IV**
**Conversion**
**(Plaintiffs v. Defendants)**

85.     The Plaintiffs hereby re-allege and incorporate by reference the allegations contained in paragraphs 1-52 above as if fully set forth herein.

25

86.     As more fully described hereinabove, the Defendants improperly gained access to the Companies' Office, and removed certain of the Companies' property.

87.     The Defendants also have improperly removed or diverted specifically identifiable funds from the Unauthorized Account, and, on information and belief, money from other of the Plaintiffs' bank accounts.

88.     The Plaintiffs, through Mr. Lowe, have demanded that the Defendants return the referenced property and funds.

89.     To date, though, the Defendants have failed and refused to do so.

90.     The Defendants' actions in that regard are improper, and have deprived the Plaintiffs of their ownership interests in, and ability to deal with, their property and funds.

WHEREFORE, the Plaintiffs respectfully request that the Court enter its judgment (a) awarding the Plaintiffs compensatory damages, together with interest as allowed by law; (b) ordering the Defendants to return all property and to return control of the Domain Site, telephone numbers, other property rights; (c) awarding the Companies the costs of this action; (d) Awarding the Companies punitive damages; and (e) granting such other and further relief as the Court deems proper.

### Count V
### Trademark Infringement & Counterfeit
### (Get Motivated Seminars, Inc. v. Defendants)

91.     The Plaintiffs hereby re-allege and incorporate by reference the allegations contained in paragraphs 1-52 above as if fully set forth herein.

92.     GMS's Marks are valid marks entitled to protection under the Lanham Act, 15 U.S.C. § 1114.

93.     The Defendants' use of the Marks in connection with the sale, offering for sale, distribution, and advertising of their goods and services in interstate commerce is unauthorized.

4848-8124-6734.2

94.     The Defendants' unauthorized use of the Marks has caused or is likely to cause confusion and mistake in the minds of the public, or has deceived or was likely to deceive the public, as to the affiliation, connection, or association of Defendants with GMS.

95.     The Defendants' acts constitute trademark infringement and counterfeiting in violation of 15 U.S.C. § 1114.

96.     The Defendants' acts of trademark infringement were willful and were committed in bad faith with knowledge and intent to cause confusion, mistake, and deception.

97.     As a direct and proximate result of the Defendants' wrongful acts, GMS has suffered and will continue to suffer damage to its business reputation and goodwill.

WHEREFORE, the Plaintiffs respectfully request that the Court enter its judgment

a.     Temporarily, and upon final hearing permanently, enjoining the Defendants, and all persons or entities acting in concert or participation with them, from using, offering for sale, soliciting sales, advertising, or marketing any service or good under any mark, name, symbol, logo, or other indicia that incorporates or is confusingly similar to the GMS Marks;

b.     Directing the Defendants, and all persons or entities acting in concert or participation with them, to deliver to the Plaintiffs all signs, advertisements, literature, packaging, containers, labels and any other promotional and marketing material which bear the GMS Marks, any other mark confusingly similar to the GMS Marks;

c.     Directing the Defendants to return control of the Domain Site to the Plaintiffs.

d.     Ordering an equitable accounting of all profits or other benefits realized by the Defendants, or by any persons or entities acting in concert or participation with them, as a result of their improper actions (as described above), and imposing a constructive trust in favor of the Companies over all such profits or benefits;

27

e.     Awarding the Plaintiffs compensatory damages and all other relief, statutory or otherwise, to which they are entitled, together with interest as allowed by applicable law;

f.     Awarding the Plaintiffs three times the amount of compensatory damages and profits pursuant to 15 U.S.C. § 1117;

g.     Awarding the Companies their costs and reasonable attorneys' fees;

h.     Awarding the Companies punitive damages; and

i.     Granting such other and further relief that the Court deems proper.

## Count VI
## Unfair Competition & Cyberpiracy
## (Plaintiffs v. Defendants)

98.     The Plaintiffs hereby re-allege and incorporate by reference the allegations contained in paragraphs 1-52 above as if fully set forth herein.

99.     The Plaintiffs are the owners of the GMS Marks and Name.

100.     The Marks and Name are famous and distinctive.

101.     The Defendant's use of the GMS Marks and Name in connection with the sale, offering for sale, distribution, and advertising of their goods and services was unauthorized.

102.     The Defendants' unauthorized use of the Name and Marks has caused or is likely to cause confusion and mistake in the minds of the public, or has deceived or was likely to deceive the public, as to the affiliation, connection, or association of Defendants with the Plaintiffs, and/or to Plaintiffs sponsorship or approval of the Defendants' goods and services.

103.     The Defendants' unauthorized use of the Name and Marks occurred after the Name and Marks became famous.

104.     The Defendants' acts constitute unfair competition, false designation of origin, and dilution of famous marks in violation of 15 U.S.C. § 1125(a) & (c), and Florida statutory and common law.

28

105.    Defendants' acts also constitute cyberpiracy in violation of 15 U.S.C. § 1125(d).

106.    The Defendants' acts of dilution were willful and were committed in bad faith with knowledge and intent to cause confusion, mistake, and deception.

107.    As a direct and proximate result of the Defendants' wrongful acts, the Plaintiffs have suffered and continue to suffer damage to their business reputation and goodwill.

WHEREFORE, the Plaintiffs respectfully request that the Court enter its judgment

a.    Temporarily, and upon final hearing permanently, enjoining the Defendants, and all persons or entities acting in concert or participation with them, from using, offering for sale, soliciting sales, advertising, or marketing any service or good under any mark, name, symbol, logo, or other indicia that incorporates or is confusingly similar to the GMS Marks & Name;

b.    Directing the Defendants, and all persons or entities acting in concert or participation with them, to deliver to the Plaintiffs all signs, advertisements, literature, packaging, containers, labels and any other promotional and marketing material which bear the GMS Marks or the Name, any other mark confusingly similar to the GMS Marks and the Name;

c.    Directing the Defendants to return control of the Domain Site to the Plaintiffs.

d.    Ordering an equitable accounting of all profits or other benefits realized by the Defendants, or by any persons or entities acting in concert or participation with them, as a result of their improper actions (as described above), and imposing a constructive trust in favor of the Companies over all such profits or benefits;

e.    Awarding the Plaintiffs compensatory damages and all other relief, statutory or otherwise, to which they are entitled, together with interest as allowed by applicable law;

f.    Awarding the Plaintiffs three times the amount of compensatory damages and profits pursuant to 15 U.S.C. § 1117;

g.    Awarding the Companies their costs and reasonable attorneys' fees;

h.      Awarding the Companies punitive damages; and

i.      Granting such other and further relief that the Court deems proper.

### Count VII
### (Florida Deceptive and Unfair Trade Practices Act)
### (Plaintiffs v. Defendants)

108.    The Plaintiffs hereby re-allege and incorporate by reference the allegations contained in paragraphs 1-52 above as if fully set forth herein.

109.    The Defendants' actions discussed above constitute deceptive trade practices in violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.*

110.    As a direct and proximate result of the Defendants' violations of the FDUTPA, the Plaintiffs have suffered and continue to suffer damage to their business reputation and goodwill.

WHEREFORE, the Plaintiffs respectfully request that the Court enter its judgment

a.      Temporarily, and upon final hearing permanently, enjoining the Defendants, and all persons or entities acting in concert or participation with them, from using, offering for sale, soliciting sales, advertising, or marketing any service or good under any mark, name, symbol, logo, or other indicia that incorporates or is confusingly similar to the GMS Marks & Name;

b.      Directing the Defendants, and all persons or entities acting in concert or participation with them, to deliver to the Plaintiffs all signs, advertisements, literature, packaging, containers, labels and any other promotional and marketing material which bear the GMS Marks or the Name, any other mark confusingly similar to the GMS Marks and the Name;

c.      Directing the Defendants to return control of the Domain Site to the Plaintiffs.

30

d.        Ordering an equitable accounting of all profits or other benefits realized by the Defendants, or by any persons or entities acting in concert or participation with them, as a result of their improper actions (as described above), and imposing a constructive trust in favor of the Companies over all such profits or benefits;

e.        Awarding the Plaintiffs compensatory damages, together with interest as allowed by applicable law;

f.        Awarding the Plaintiffs all statutory relief to which they are entitled under the FDUTPA;

g.        Awarding the Companies their costs and reasonable attorneys' fees;

h.        Awarding the Companies punitive damages; and

i.        Granting such other and further relief that the Court deems proper.

**Count VIII**
(**Civil Conspiracy**)
(**Plaintiffs v. Defendants**)

111.    The Plaintiffs hereby re-allege and incorporate by reference the allegations contained in paragraphs 1-52 above as if fully set forth herein.

112.    An agreement existed between the Defendants' to commit the unlawful acts described above.

113.    The Defendants took overt acts in furtherance of the agreement/conspiracy to commit the unlawful acts.

114.    As a direct and proximate result of the Defendants' agreement/conspiracy to commit the unlawful acts, the Plaintiffs have suffered and continue to suffer damage.

WHEREFORE, the Plaintiffs respectfully request that the Court enter its judgment (a) awarding the Plaintiffs compensatory damages, together with interest as allowed by law; (b)

4848-8124-6734.2

awarding the Companies the costs of this action; (c) Awarding the Companies punitive damages; and (d) granting such other and further relief as the Court deems proper.

/s/ Christopher L. Griffin
Christopher L. Griffin (FBN 273147)
Adam R. Alaee (FBN 0819611)
Justin R. Moore (FBN 0086168)
FOLEY & LARDNER LLP
100 North Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone: 813.229.2300
Facsimile: 813.221.4210
Attorneys for the Plaintiffs

4848-8124-6734.2